IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JIMMIE LEWIS, a/k/a Emmanuel E. Elder, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. Action No. 08-786-GMS ) |
| NANCY PEARSALL, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM**

## I. INTRODUCTION

The plaintiff, Jimmie Lewis, a/k/a Emmanuel E. Elder ("Lewis"), who proceeds *pro se*, filed this lawsuit pursuant to 42 U.S.C. § 1983. He alleges violations of his constitutional rights and raises supplemental state claims. At the time he filed the complaint, Lewis was an incarcerated individual within the Delaware Department of Correction ("DOC"). Lewis is no longer incarcerated and no longer resides in the State of Delaware. Before the court are motions for summary judgment filed by the defendants. (D.I. 99, 103.) Lewis did not respond to the motions. For the reasons that follow, the court will grant the motions for summary judgment.

## II. BACKGROUND

### A. The Complaint

The court screened the complaint on February 6, 2009, and limited the claims to the time when Lewis was at the Delaware Psychiatric Center ("DPC"), from June 6, 2007 through December 13, 2007, dismissed certain claims, and allowed Lewis to proceed with medical needs,

due process, and failure to protect claims against the defendants.[1] The complaint alleges that on May 17, 2007, DOC officials petitioned the State Court to transfer Lewis to the DPC for a mental evaluation. Lewis alleges that, from July 3, 2007 through December 12, 2007, the defendants DPC Unit Director Nancy Pearsall ("Pearsall"), psychiatrist Dr. Andrew Donohue ("Dr. Donohue"), psychologist Dr. Charlotte Selig ("Dr. Selig"), and psychiatric intern Gwen Scott-Jones ("Scott-Jones"), violated his right to due process by imposing upon him disciplinary sanctions on twenty different occasions and subjecting him to atypical and significant hardships.[2] He alleges that Jones changed his test scores to deny him psychiatric care and that all the defendants denied him psychiatric care needed to stabilize him while he was at the DPC. Finally, Lewis alleges that Pearsall failed to protect him from attack by an inmate/patient. (D.I. 2 at 20, 21, 24-26.)

### B. Medical Needs Claim

Lewis was convicted on October 21, 2003, of carjacking in the second degree, felony theft, and resisting arrest, and sentenced in February 2005, to eight years at Level V, suspended after six years for decreasing levels of supervision. *In re Lewis*, 918 A.2d 1170 (Table), 2007 WL 328806 (Del. 2007); *State v. Lewis*, I.D. No. 0305016966, 2008 WL 3413332 (Del. Super. Aug. 11, 2008). As of June 2007, he was housed at the Delaware Correctional Center (now known as the James T. Vaughn Correctional Center) in Smyrna, Delaware.

---

[1] The court dismissed classification, conspiracy, and psychiatric evaluation/report claims. (D.I. 7.)

[2] While at the DPC, Lewis submitted more than one hundred grievances. (D.I. 2 at 24.)

In June 2007, Lewis was transferred to the DPC and to undergo a court ordered psychiatric evaluation. Dr. Donohue prepared a report as a result of the evaluation and, in conjunction with the report, he consulted with Dr. Troy Thompson ("Dr. Thompson"), senior staff psychiatrist at the DPC, for a second opinion. Both doctors concluded that Lewis was feigning or exaggerating psychotic symptoms, and that Lewis' expressed symptoms were inconsistent and primarily present when interacting with the treatment team.[3] Subsequently, two tests were administered to Lewis and both suggested the possibility of an overt exaggeration of complaints and problems. Scott-Jones, an intern, administered the second test.[4] According to Dr. Selig, Lewis did not present, in an authentic manner, any legitimate constellation of symptoms that would have resulted in any other diagnosis. According to Dr. Donohue, the tests confirmed the diagnosis of feigning or exaggerating psychotic symptoms.[5] Based upon the diagnosis, Dr. Donohue concluded that Lewis did not have any treatable psychiatric condition and recommend that he be discharged and returned to the DOC. Prior to completion of the evaluation, Court Commissioner Reynolds of the Superior Court in and for New Castle, Delaware, determined there was insufficient probable cause to involuntarily treat Lewis. (D.I. 2 at 2-3; D.I. 101, A1, A8; D.I. 104, exs. A, B, C, E.)

---

[3]The treatment team includes representatives from the fields of criminal justice, psychiatry, psychology, social services, nursing, nutrition, therapeutic recreation, and clergy/spiritual leaders. (D.I. 101, A42.)

[4]Scott-Jones was not a permanent employee of the DPC and her tasks were completed under Dr. Selig's direction. On information and belief, Scott-Jones left DPC by the end of June 2007. (D.I. 101, A8, A127.)

[5]Lewis took exception to the use of a pencil in the administration of the test. He believed his responses could be "erased and reauthored to reflect an unrealistic and unfavorable diagnosis." (D.I. 101, A60-61, A89.)

During the six months following administration of the tests, Lewis was provided with hospitalization and care at the DPC wherein the clinical staff had the opportunity to clinically observe and assess Lewis to ascertain the validity of his claims of symptoms. The record reflects that Lewis was provided individual treatment based on his behavioral presentation. In addition, he was offered alternative intervention, including individual therapy and group programming. Lewis was offered, and refused, appropriate medications to address his complaints of symptoms. Lewis' grievances indicate that he disagreed with the proffered treatment. (D.I. 101, A9, A53, A58-60, A85; D.I. 104, ex. A.)

On October 23, 2007, counsel for the DPC wrote to the State Court and asked for Lewis' return to the DOC based upon the DPC evaluation that found Lewis inappropriate for treatment there. On November 28, 2007, the Delaware Superior Court ordered the transfer of Lewis to the DOC and Lewis was discharged from DPC on about December 14, 2007. At that time, Dr. Donohue authored a second report, noted there was no diagnosis of mental illness, but warned that despite the lack of a treatable psychiatric condition, Lewis might still represent a danger to himself as he was capable of manipulative action in order to achieve a desired result, and that could result in self-injury with the goal of forcing a psychiatric admission. Dr. Donohue recommended that Lewis be placed on a high level of psychiatric observation to insure his safety upon his return to the DOC and that he be given the opportunity to gradually earn reduced observation as he demonstrated positive coping skills. (D.I. 101, A2; D.I. 104, exs. C, D.)

### C. Failure to Protect Claim

Lewis had complained about a male patient/inmate ("male patient") and, based upon his complaints, he was moved to the opposite side of the "open" male housing unit. On Saturday,

August 25, 2007, there was incident between Lewis and the male patient, who were separated by a locked Unit door with a safety-glass window. As Lewis was being taken from the locked unit door, the other male patient punched his side of the locked door and, in turn, Lewis punched his side of the locked door through the window which caused multiple lacerations to his right arm. Pearsall was not at work on August 25, 2007. Lewis was taken to the emergency room, but he refused treatment. Lewis subsequently attended a meeting with the treatment team on August 27, 2010, and was placed on full restrictions for an additional fourteen days for damaging State property. (D.I. 101, A4, A100-105.)

### D. Due Process Claim

At admission to the DPC, Lewis was verbally informed, and provided with a written copy, of the unit rules and procedures regarding rule infractions, including privilege restrictions for threats and physical aggression, and seclusion/restrain procedures. The information is provided to all patients upon admission and all patients are subject to the same privilege levels and restrictions. Violations of the rules could include placement on restriction or loss of privileges. For example, patients presenting threats or aggression are subjected to consequences that could preclude access to vending machines, special events, limited visits, gym/weight room access, and limited fresh air breaks. (D.I. 101, A6-8, A128-146; D.I. 104, ex. E.)

Upon admission, Lewis was placed on Privilege Level A, the same level placement for all patients upon admission.[6] He was housed in an "open" male unit at DPC, and his housing placement allowed him to socialize with peers on his assigned side of the unit, undergo regularly

---

[6]The Levels Program is a series of privileges that patients may earn for demonstrating positive behavioral choices. (D.I. 101, A35.)

scheduled treatment, and participate in activity groups, such as an anger management group, dance therapy, and dayhall time.[7] During his allotted breaks, Lewis played board games, card games, and ping pong, attended group treatment, and played ball on the outdoor patio with peers. (D.I. 101, A8-10.)

Lewis had opportunities to meet weekly with the treatment team to discuss his grievances and present information to support his complaints, to discuss clinical concerns, allegations of rule infractions, appropriate consequences, privileges, and restrictions. At times, he refused to attend meetings. In addition, Lewis had regular access and opportunities to utilize the services of a patient advocate, a consumer advocate, a law library, a law librarian, and a social worker, and received attendance and assistance by an individual from the legal aid society. Lewis utilized the unit and hospital grievance procedures to file grievances regarding anything he felt was unfair, and filed well over one hundred grievances while at the DPC. (D.I. 101, A3-4, A10, A49, A128-146; D.I. 104, ex. E.)

According to Dr. Selig, Lewis' numerous behavioral problems, including stealing, threatening, aggression, property damage and physical assaults on other patients and DPC staff, resulted in Lewis' placement on full restrictions. The record reflects that while Lewis was at the DPC, he engaged in inappropriate behavior on numerous occasions. Examples include loud and disruptive behavior, verbally threatening and swearing at staff, taking keys from an attendant, numerous instances of refusing to obey orders, numerous threats to staff, destroying a toilet, breaking a window, taunting patients, verbal confrontations with other patients, fighting with

---

[7]Dayhall time affords patients with access to pay phones, ping pong tables, card and board games, large screen tv/movie watching, and general socialization time, for approximately six hours per day. (D.I. 101, A9.)

other patients, exposing self and masturbating, sexual inappropriateness with staff, physically attacking staff, throwing water and other items at the staff. (D.I. 101, A10; D.I. 104, ex. F.)

As part of the rule violation process, Lewis was given regular access to the presentation of allegations and an opportunity to discuss any and all allegations of rule infractions during treatment team meetings. During these meetings, Lewis would have been informed of alleged violations, with the relevant progress note either read directly to him or summarized to him, and allowed an opportunity to refute the allegations. The treatment team decided upon an appropriate consequence, if any, and conveyed that to Lewis. As events occurred, Lewis was provided regular "Level Slips" that outlined his privilege level and/or restriction status. According to Dr. Donohue, Lewis was placed on restrictions when his behavior warranted it, and the restrictions were appropriately imposed to address and manage Lewis' violent behavior.[8] Lewis was permitted additional luxuries when he earned them and when he demonstrated that he was safe enough to have them and not endanger himself or others. (D.I. 101, A128-146, D.I. 104, ex. E.)

## III. STANDARD OF REVIEW

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

---

[8]For example, on August 16, 2007, Lewis was placed on full restrictions for theft of state property (thirty days), threatening (two weeks) and destruction of property (two weeks). (D.I. 101, A130.)

n.10 (1986). "When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). Moreover, "the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks omitted).

The defendants move for summary judgment on the grounds that they are immune from liability, they did not deny Lewis' right to due process, Lewis was afforded medical care based upon his presented symptoms, and lack of personal involvement. (D.I. 100, 104.) Lewis did not respond to the motions. The court will not, however, grant the entry of summary judgment without considering the merits of the defendants' unopposed motions. *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991) (holding that a district court should not have

granted summary judgment solely on the basis that a motion for summary judgment was not opposed.").

## IV. DISCUSSION

### A. Eleventh Amendment Immunity

The defendants move for summary judgment to the extent that Lewis seeks damages against them in their official capacities. The Eleventh Amendment guarantees that non-consenting states may not be sued by private individuals in federal court unless Congress abrogates the states' immunity pursuant to a valid exercise of its power. *See Board of Trustees of the Univ. of Al. v. Garrett*, 531 U.S. 356, 363 (2001). State officials acting in their official capacities have the same Eleventh Amendment immunity from damage suits as the state itself. *See Hafer v. Melo*, 502 U.S. 21, 30 (1991). Section 1983 did not abrogate the State of Delaware's Eleventh Amendment immunity and it has not waived its immunity. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979) (section 1983 was not intended to abrogate a State's Eleventh Amendment immunity); *Brooks-McCollum v. Delaware*, 213 F. App'x 92, 94 (3d Cir. 2007) (not published) (The State of Delaware has not waived its immunity from suit in federal court). To the extent the defendants are sued in their official capacities, they are immune from suit. Therefore, the court will grant the defendants' motion for summary judgment as to this issue.

### B. Personal Involvement

Pearsall moves for summary judgment on the ground that she did not personally participate in the alleged constitutional violations wherein Lewis alleges that she failed to protect him from another patient. The incident complained of occurred on August 25, 2007. It is

undisputed that Pearsall did not work that day. Scott-Jones moves for summary judgment on the due process issue on the grounds that she was not at the DPC from July 3, 2007, through December 12, 2007, and therefore, had no personal involvement in Lewis' loss of privileges during that time. It is undisputed that Scott-Jones last worked at the DPC in June 2007.

As is well established, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

"Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, __U.S.__, 129 S.Ct. 1937, 1948 (2009). In *Iqbal*, the Supreme Court emphasized that "[i]n a § 1983 suit - here masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S.Ct. at 1949. "Thus, when a plaintiff sues an official under § 1983 for conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well." *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) (quoting *Iqbal* 129 S.Ct. at 1949.) The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue. *Id.*

There is no evidence of record showing Pearsall's personal involvement in the failure to protect Lewis from another patient. Nor is there evidence showing Jones' personal involvement in Lewis' alleged denial of his due process rights. Inasmuch as there are no genuine issues of fact, a reasonable jury could not find in favor of Lewis as to these claims. For the above reasons, the court will grant Pearsall's and Scott-Jones' motion for summary judgment on the issue of lack of personal involvement.

### C. Medical Needs

The defendants move for summary judgment on the grounds that Lewis received an assessment of his mental health and was afforded appropriate medical care based upon his presented symptoms.

Lewis was transferred to the DPC to undergo a psychiatric/psychological evaluation pursuant to chapter 50 of the Delaware Code. Chapter 50 provides for the involuntary commitment of the mentally ill. Hence, at the time Lewis was both a sentenced inmate and an individual being evaluated for involuntary commitment.

The United States Supreme Court has recognized that, in the context of the involuntarily committed, under the Fourteenth Amendment, "the essentials of care that the State must provide" include the duties of providing food, shelter, clothing, and medical care. *See Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). Persons who are subjected to involuntary civil commitment are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 322. Only decisions that are made by the "appropriate professional" are entitled to a presumption of correctness. *Id.* at 324. Some courts, when analyzing involuntary commitment cases, have applied the standard used by pretrial

detainees challenging the medical treatment conditions of confinement, others have applied the Eighth Amendment deliberate indifference standard used for sentenced inmates, while others employ the *Youngberg* professional judgment standard. *See Serna v. Goodno,* 567 F.3d 944, 948 (8th Cir. 2009) (reasoning that "confinement in a state institution raise[s] concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations"); *Terrance v. Northville Reg'l Psychiatric Hosp.,* 286 F.3d 834, 842-43 (6th Cir. 2002) (mental patient who was involuntarily committed to state psychiatric hospital for psychiatric treatment was similarly situated to a prisoner with regard to the Eighth Amendment right to medical care, for purposes of patient's claim for deliberate indifference to his serious medical needs); *Patten v. Nichols,* 274 F.3d 829, 838 (4th Cir. 2001) (denial of medical care claims asserted by involuntarily committed psychiatric patients must be measured under the *Youngberg* professional judgment standard).

The Third Circuit has found that Eighth Amendment standards are applicable to a civilly committed patient's claim under the Due Process Clause of the Fourteenth Amendment. *Rivera v. Marcoantonio,* 153 F. App'x 857, 859 n.1 (3d Cir. 2005) (not published). The Fourteenth Amendment affords pretrial detainees protections that are "at least as great as the Eighth Amendment protections afforded to a convicted prisoner." *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983)). Hence, when assessing medical claims by pretrial detainees, courts may apply the deliberate indifference standard established under the Eighth Amendment but must view the inquiry in the context of the *Bell v. Wolfish* standard, which applies Fourteenth

Amendment due process principles and not the cruel and unusual punishment standard to pretrial detainees. *See Hubbard v. Taylor,* 399 F.3d 150, 165-66 (3d Cir. 2005). The deliberate indifference standard requires a finding of a serious medical need and acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale,* 318 F.3d at 582. A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)

While Lewis alleges denial or inadequate mental health treatment, he produces no evidence of the same to this court. Notably, the record reflects that Lewis was constantly monitored and received medical care on a regular basis during his entire stay at the DPC. The record does not reflect deliberate indifference on the part of the defendants and, therefore, Lewis cannot prevail on this claim using a pretrial detainee analysis. Lewis also cannot prevail when analyzing the claim under the *Youngberg* professional judgment standard. The evidence does not demonstrate the defendants did not base their medical decisions on accepted professional judgment, practice, or standards. *See Youngberg*, 457 U.S. at 323. Upon review of the record, the court finds that there is insufficient evidence to enable a jury to reasonably find for Lewis on the medical needs issue. Therefore, the court will grant the defendants' motions for summary judgment as to this issue.[9]

### D. Due Process

The defendants seek summary judgment on Lewis' claims that he was denied due process with the imposition of disciplinary sanctions or loss of privileges on the grounds that the

---

[9]Lewis also could not prevail under the Eighth Amendment deliberate indifference standard used for sentenced inmates. As discussed, the record indicates that he received ongoing medical care.

claims are without merit, Lewis fails to allege a violation of a protected interest, the procedures for imposing restrictions were sufficient and consistently followed, and restrictions were appropriately applied to address Lewis' behavior.[10]

The rights of patients in psychiatric hospitals more appropriately arise under the Fourteenth Amendment. *Youngberg,* 457 U.S. at 324-325. Patients who are involuntarily committed to mental health institutions retain certain liberty interests, including personal security and the freedom of movement, often referred to as the freedom from bodily restraints. *Id.* Institutionalized persons have "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.* at 324; *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) (the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services

---

[10]The Due Process Clause itself confers no liberty interest in freedom from state action taken "within the sentence imposed." *Sandin v. Conner,* 515 U.S. 472, 480 (1995) (quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983)). State created liberty interests protected by the Due Process Clause are generally limited to restraints on prisoners that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Griffin v. Vaughn,* 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin,* 515 U.S. at 484). In deciding whether a protected liberty interest exists under *Sandin,* a federal court must consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn,* 318 F.3d 523, 532 (3d Cir. 2003) (citing *Shoats v. Horn,* 213 F.3d 140, 144 (3d Cir. 2000)).

The Third Circuit has extended *Sandin* to a certain group of civil commitment challenges - convicted sex offender civilly committed to an institution pursuant to the Sexually Violent Predator Act. *See Deavers v. Santiago,* 243 F. App'x 719 (3d Cir. 2007) (not published); *Rivera v. Rogers,* 224 F. App'x 148 (3d Cir. 2007) (not published) ("Given that [the plaintiff] has been convicted of a crime and is being detained in the Special Treatment Unit because of his classification as a sexually violent predator under New Jersey's Sexually Violent Predator Act, his status is similar to that of a prisoner.").

as are necessary to ensure their "reasonable safety" from themselves and others). Also, the protections of the Due Process Clause, both substantive and procedural, may be triggered when the State, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement. *DeShaney*, 489 U.S. at 200 n.8.

Involuntarily committed patients "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321-22. In order to ascertain whether a state has adequately protected the rights of an involuntarily committed individual, the Supreme Court established "professional judgment" as the standard used in balancing the individual's "liberty interests against the relevant state interests." *Id.* at 321. Decisions made by the appropriate professional are entitled to a presumption of correctness, and are entitled to deference, unless it is established that the person responsible did not base the decision on accepted professional judgment. *Id.* at 323. Liability arises "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* at 323. Professional judgment devoid of reason or purpose and retributive in nature is not, however, afforded deference under *Youngberg. Scott v. Plante,* 691 F.2d 634, 637 (3d Cir. 1982) ("So long as judge or jury determines that the conditions imposed were not punitive in nature or purpose, reasonableness of nonpunitive conditions rests on whether the decision to subject the patient to such conditions was made by a professional competent in the relevant discipline."). Accordingly,

to overcome the presumptive validity of the defendants' decisions, Lewis must present facts that indicate the defendants did not base their decisions on professional judgment.

Although involuntarily committed individuals may not be subjected to punitive conditions of confinement, the State's interests in order, security, and effective management apply just as strongly in the civil institution setting. "In operating an institution . . . there are occasions in which it is necessary for the State to restrain the movement of residents – for example, to protect them as well as others from violence." *Youngberg,* 457 U.S. at 320. Accordingly, the due process clause does not prevent officials at civil institutions like the DPC from imposing rules to maintain security and order and from imposing minor sanctions for violations of those rules. *See Bell v. Wolfish,* 441 U.S. 520, 537 (1979) ("This Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may.").

In the present case, the DPC has an interest in running an administratively efficient institution, but such an interest does not trump the constitutional rights of Lewis who was sent to the DPC for evaluation. When he was transferred to the DPC, Lewis was given verbal and written notice of what was expected of him and what could happen if he did not comply with the DPC rules. In virtually every instance, Lewis' privileges were revoked or he was disciplined as a result of his conduct. He was given an opportunity to meet with the treatment team to discuss his behavior. The record reflects the defendants took actions they did for the safety of Lewis, as well as the safety of the other patients and the staff. There is no evidence of record that the actions taken by the defendants were not based upon accepted professional judgment or were taken for the purpose of punishment.

After reviewing the record, the court concludes that no reasonable jury could find violations of Lewis' due process rights. Therefore, the court will grant the defendants' motion for summary judgment on the due process issues.[11]

### E. Supplemental Claims

A federal court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). As discussed above, the court will grant the defendants' motions for summary judgment. Therefore, the court declines to exercise jurisdiction over Lewis' remaining state law claims. *See* 28 U.S.C. § 1367; *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003).

## V. CONCLUSION

For the above reasons, the court will grant the grant the defendants' motions for summary judgment.

An appropriate order will be issued.

CHIEF, UNITED STATES DISTRICT JUDGE

June 16, 2011
Wilmington, Delaware

---

[11]Lewis could not prevail as a sentenced inmates inasmuch as the record does not reflect a protected liberty interest with respect to his discipline, confinement, and loss of privileges. *See* n.10, *supra*.